**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF PUERTO RICO**

**FREMIA CEBALLOS-GERMOSEN**,

    Plaintiff,

    v.

**SOCIEDAD PARA ASISTENCIA
LEGAL, ET ALS.,**

    Defendants.

CIV. NO. 16-02944 (PG)

## AMENDED OPINION AND ORDER *NUNC PRO TUNC*

Before the court is Defendants' Statement of Uncontested Facts ("DSUMF") (ECF No. 89), Motion for Summary Judgment and Memorandum in Support Thereof (ECF No. 90), Plaintiff's Response in Opposition (ECF No. 105), Plaintiff's Response in Opposition to Defendants' Statement of Uncontested Facts and Proposed Statement of Additional Uncontested Material Facts ("PSUMF")[1] (ECF No. 106), and Defendants' Reply in Support of Defendants' Motion for Summary Judgment (ECF No. 113). For the reasons below, the court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for Summary Judgment.

## I.   BACKGROUND

On November 7, 2016, Fremia Ceballos-Germosén ("Plaintiff" or "Ceballos") filed this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e *et seq*. ("Title VII"), against her employer Sociedad para Asistencia Legal ("SAL")[2], certain SAL executives, among them, Felix Vélez-Alejandro ("Vélez"), Federico Rentas-Rodríguez ("Rentas"),

---

[1] The court will use the acronym "PSUMF" whenever it refers to Plaintiff's responses as to the proposed Statement of Uncontested Facts filed by Defendants.

[2] SAL is a "not for profit corporation duly registered with the Commonwealth of Puerto Rico". <u>See</u> Second Amended Complaint, at ECF No. 55 at ¶ 11.

Héctor Quiñones-Vargas ("Quiñones"), Jesús Hernández-Rivera ("Hernández"), José Cobián-Tormos ("Cobián"), and AIG Insurance Company ("AIG").[3] Ceballos claimed that Defendants, both in their individual and official capacities, discriminated and created a hostile work environment on the basis of sex and national origin. Furthermore, that they retaliated against her for engaging in protected conduct such as complaining of unlawful employment practices. Plaintiff also invoked supplemental jurisdiction over her state law claims under Law No. 100 of June 30, 1959 ("Law No. 100"), P.R. LAWS ANN. tit. 29, § 146, *et seq*.; Law No. 115 of December 20, 1991 ("Law No. 115"), P.R. LAWS ANN. tit. 29, § 194, *et seq*.; Law No. 69 of July 6, 1985 ("Law No. 69"), P.R. LAWS ANN. tit. 29, § 1321 *et seq*.

## II.    STANDARD OF REVIEW

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure, which entitles a party to judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When the party who bears the burden of proof at trial is faced with a properly constituted summary judgment motion, defeating the motion depends on her ability to show that such a dispute exists." Geshke v. Crocs, Inc., 740 F.3d 74, 77 (1st Cir. 2014) (*citing* Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010)).

At this juncture, the court must examine the facts in the light most favorable to the non-movant, indulging that party with all possible inferences to be derived from the facts. See Rochester Ford Sales, Inc. v. Ford Motor Co., 287 F.3d 32, 38 (1st Cir. 2002). The court need not "draw unreasonable inferences or credit bald assertions, empty conclusions, rank

---

[3] See Initial Complaint at ECF No. 1 (amended on February 2, 2018, to dismiss the action against AIG, among others (ECF No. 55)).

conjecture or vitriolic invective." Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017) (*quoting* Pina v. Children's Place, 740 F.3d 785, 795 (1st Cir. 2014)). The court reviews the record "as a whole," and "may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 135 (2000). This is because credibility determinations, the weighing of the evidence and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. Id.

If the non-movant generates uncertainty as to the true state of any material fact, the movant's efforts should be deemed unavailing. Suarez v. Pueblo Int'l, 229 F.3d 49, 53 (1st Cir. 2000). But the mere existence of "some alleged factual dispute between the parties will not affect an otherwise properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). See Cherkaoui, 877 F.3d at 23-24 (*quoting* Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)) (*noting* that "[f]acts are material when they have the 'potential to affect the outcome of the suit under the applicable law'" and that "[a] dispute is 'genuine' if 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party'").

### III.    FINDINGS OF FACT

Before setting forth the facts found by this court to be undisputed and relevant to this case, we must address several procedural issues. In addition to Federal Rule of Civil Procedure 56, the local rules of civil procedure govern the parties' submissions of summary judgment materials. See L.Cv.R. 56 (D.P.R. 2009). In pertinent, the Rule states:

> A motion for summary judgment shall be supported by a separate, short, and concise statement of material facts, set forth in numbered paragraphs, as to which the moving party contends there is no genuine issue of material fact to be tried. Each fact asserted in the statement shall be supported by a record as required by subsection (e) of this rule. L.Cv.R. 56(b).

In her Response in Opposition to Defendant's Motion for Summary Judgment (ECF No. 105), Ceballos complains that Defendants' Statement of Uncontested Facts relies "heavily in self serving and tailored made affidavits -most of which are inadmissible evidence-" and appear to be "suspicious". ECF No. 105, at page 1. In response, Defendants' argue that the reason why the unsworn statements are similar to the statement of facts, allegedly appearing suspicious, is because (1) "those were indeed the facts", and because (2) there is no other testimony by the co-defendants due to the fact that Plaintiff "did not conduct a single deposition during the case and thus did not interrogate any of the co-defendants as to the incidents of the record". ECF No. 113, at page 2. Ceballos also complains that Defendants relied on affidavits containing conclusory allegations, lacking foundation, and based on hearsay. ECF No. 105, at page 3.

It is settled that "**[e]ven a clearly self-serving affidavit constitutes evidence which the court must consider when resolving summary judgment motions**." Malave-Torres, 919 F.Supp.2d 198, 204 (D.P.R. 2013) (emphasis added) (*citing* Cadle Co. v. Hayes, 116 F.3d 957, 961 n. 5 (1st Cir. 1997) ("A party's own affidavit, containing relevant information of which he has first-hand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment.")). Furthermore, the analysis of whether an affidavit should be stricken from an opposition to a motion for summary judgment does not end with a determination that the affidavit is self-serving; instead, the court must determine whether the affidavit is a sham. See id. To do so, the court must question if statements in the affidavits are made from personal knowledge, setting out facts that would be admissible, not based on assumptions, conclusions or surmise. Pérez v. Volvo

Car Corp., 247 F.3d 303, 315-316 (1st Cir. 2001) (*citing* Sheinkopf v. Stone, 927 F.2d 1259, 1271 (1st Cir. 1991).

After reviewing the statements under penalty of perjury presented by both Plaintiff and Defendants, this court understands that said affidavits qualify or deny the content of the set of facts proposed by both parties complying thus with the applicable Rule. Fed.Rules Civ.Proc.Rule 56(c)(4). See, for example, Levine-Díaz v. Humana Health Care, 990 F. Supp. 2d 133 (D.P.R. 2014). Most—if not all—statements rely on the personal knowledge of the witnesses and are based on specific factual recounts of the events alleged in Plaintiff's complaint. See affidavits located at ECF No. 89-1, 89-2, 89-3, 89-4 and ECF No. 106-1. Furthermore, as previously discussed, this court need not entertain the idea that an affidavit is to be discarded for being "suspicious" or self-serving alone. This is not the standard to be held when evaluating whether to consider affidavits introduced as part of motions for summary judgment. As a result, it is worth noting that in constructing the following undisputed relevant facts, the court has indeed excluded from consideration any statement not founded on personal knowledge or contradicting to previous declarations made by the parties. Pérez, 247 F.3d at 315-316; Malave-Torres, 919 F.Supp.2d at 204. Moreover, it is worth noting that in their proposed facts, both parties raised frivolous and impertinent objections, and attempted to introduce irrelevant facts to their statements. This courts' summary of the facts omits such objections.

On the other hand, Defendants, in their Reply to Plaintiff's Opposition, allege that Ceballos "fails to cite a single document on the record in support of her proposed facts". ECF No. 113, at page 2. From the reading of the pertinent documents, it is evident that this is not true. The norm requires for the nonmovant to point the court to places in the record that

would contest the proposed facts.[4] Ceballos indeed cites the pertinent record to contest movants' version of the facts. Particularly, she cites her deposition, as well as her affidavit and some record components. "An assertion of fact set forth in a statement of material facts shall be followed by a citation to the specific page or paragraph of identified record material supporting the assertion." See L. Cv. R. 56(e) (D.P.R. 2009). The court will now outline each undisputed incident involving the parties.

### Ceballos as an Employee for SAL

Ceballos is a woman of Dominican Republic decent, resident of Bayamón, Puerto Rico. Amended Complaint, ECF No. 55 at ¶ 10. Ceballos was hired in 1999 as an Attorney by SAL, which is a non-profit corporation that provides legal services to indigent criminal defendants. DSUMF at ¶¶ 1, 16. Ceballos became a regular employee for SAL on January 16, 2001; by then she worked as an Attorney at the Bayamón Office. DSUMF at ¶¶ 16-18; ECF No. 55 at ¶ 20. Codefendant, Quiñones, was Ceballos' supervisor from 2005 to 2016. DSUMF at ¶ 6. Meanwhile, Hernández occupied the position of Deputy Director of the SAL Office in Bayamón since 2011, when he became supervisor for Ceballos alongside Quiñones. DSUMF at ¶ 7. Codefendants, Rentas and Vélez were SAL's Executive Directors during the time Ceballos encountered the alleged discrimination. DSUMF at ¶¶ 2-3. Rentas was SAL's Executive Director from 1996 until 2015 and Vélez since 2015. Id. Cobián is SAL's Human Resources Director since 1996. DSUMF at ¶ 4. Leading up to her recruitment, Ceballos was

---

[4] Rule 56(c) of the Federal Rules of Civil Procedure allows for disposition of a case if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Sands v. Ridefilm Corp., 212 F.3d 657, 660 (1st Cir.2000). Furthermore, "[u]nless a fact is admitted, the opposing statement shall support each denial or qualification by a record citation as required by this rule." L.Cv.R. 56(b).

interviewed by Rentas, Cobián and Vélez. DSUMF at ¶ 11.

Ceballos originally filed this complaint in 2016 and continued to work for SAL. In it, Ceballos expressed being subject to aggressive actions by her supervisors, as well as discriminatory conduct and hostility during the years leading to the complaint, particularly, from 2005 and until 2016, but more importantly from 2014 onwards. See ECF No. 55 at ¶¶ 21-36. Plaintiff has further expressed that she aspired to be in an environment of peace but that she had to complain several times to her supervisors; all of them without positive results. Ceballos alleges she was a victim of retaliation. See PSUMF at ¶¶ 3-5. There is a group of attorneys in SAL Bayamón to which Ceballos refers as the "Boys Club". Ceballos' supervisors—now codefendants—are in this group. Ceballos alleges that the "Boys Club" discriminated against her and was benefited in labor aspects, such as case assignment, attendance sheets and lack of corrective actions. Female employees in SAL participate in lunch meetings with the "Boys Club". DSUMF at ¶¶ 245-250.

### Absence Memorandum dated June 4, 2008

On June 4, 2008, Quiñones sent Ceballos a memorandum informing that since she was going to be away from Puerto Rico from June 3 to June 11, SAL would notify the court to reschedule any hearings involving her. DSUMF ¶¶ 24-25. Quiñones also wrote that if other attorneys were available to interview indigent defendants then those attorneys would conduct such conferences, otherwise, the interviews would stay assigned to Ceballos for her to carry out upon returning. DSUMF at ¶ 26. In his memorandum, Quiñones copied Hernández and Fernando Abreu ("Abreu"), attorneys for SAL Bayamón. DSUMF at ¶ 27. Ceballos believes that the reason for copying them was because they were members of the "Boys Club". In addition, that copying Hernández and Abreu constituted an adverse

employment action. Docket No. 106, PSUMF at ¶ 27 and ¶ 29.[5] At that time, Ceballos did not complain to any supervisor about this. DSUMF at ¶ 28.

### **Parking Issues and Distribution of Spaces**

In 2012, SAL Bayamón had 14 attorneys employed, but the office only had 10 parking spots available inside the Bayamón Judicial Center. DSUMF at ¶¶ 30-31. The parking spaces were allotted pursuant to seniority status. DSUMF at ¶¶ 32-33. Plaintiff's Deposition, ECF No. 89-8, page 115, lines 8-25. The spaces belonged to both female and male attorneys alike, yet some apparently had lesser seniority than Ceballos.[6] Id. Since 2005, Ceballos had a parking spot in a lot belonging to the Municipality of Bayamón, adjacent to the Bayamón Judicial Center and though the protocol for assigning parking spaces was based on seniority, Ceballos was not assigned a SAL parking space inside the Judicial Center until she sent two letters in August 2012 requesting such accommodation. DSUMFs ¶¶ at 33, 37-38. This happened after the Municipality of Bayamón, in the Summer of 2012, prohibited SAL employees from using its parking. DSUMF at ¶ 36.

After the letters, and upon request from Rentas, Quiñones gave his own parking space to Ceballos. DSUMF at ¶ 39. However, the administration of the Bayamón Judicial Center informed Quiñones that he could not assign his parking since he was a supervisor to Ceballos. DSUMF at ¶ 23. For such, Ceballos was later assigned a new parking spot inside

---

[5] As we will see, to constitute an adverse employment action under hostile environment standards, an act must materially change the conditions of the plaintiff's employment or benefits. Gu v. Boston Police Dep't, 312 F.3d 6, 14 (1st Cir. 2002). Nothing in the record demonstrates that by copying Hernández or Abreu, Ceballos was affected in such a way. The only reasonable explanation for copying them, per the record, was to notify them in case they needed to take turns to relieve Ceballos during her absence.

[6] Ceballos qualified and denied in part Defendants' proposed fact by declaring in her deposition that some of the attorneys who had parking assigned were indeed of lesser seniority, which violated the prevailing parking assignment norm. Consequently, whether a seniority norm existed, and whether attorneys of lesser seniority indeed possessed parking spaces, stands controverted from the record. DSUMF at ¶¶ 32-33. ECF No. 89-8 page 115, lines 8-25

the Court, but she does not know to whom it originally belonged or if it was facilitated by her supervisors.[7] On August 28, 2012, same day Ceballos sent the second letter requesting for a parking change, she received a parking ticket of fifteen dollars to which she sent a separate letter to Cobián requesting SAL to pay the ticket. DSUMF at ¶¶ 44-45. In this letter, Ceballos alleged that she could not walk long distances due to a medical condition and did not have parking space assigned to her. Id. On October 25, 2012, Cobián wrote back to Ceballos and informed that the supervisors would personally cover the costs of the ticket. Cobián paid for the ticket personally. DSUMF at ¶¶ 46-48.

### Spray Incident and Subsequent Events[8]

Dulce Paredes ("Paredes") is a Dominican woman who works as Office Custodian for SAL Bayamón. DSUMF at ¶ 49. She began working in March 1, 2006. DSUMF at ¶ 50. Gladys Rivera ("Rivera") is the Supervisor of the Secretaries in SAL since August 29, 2011. DSUMF at ¶ 41. On August 30, 2014, Hernández was informed of an incident involving Ceballos, Rivera and Paredes. DSUMF at ¶ 53. Ceballos had requested from Paredes a spray to disinfect her office. DSUMF at ¶ 54. After asking Rivera for permission to get Ceballos a new spray, Paredes left a new container on Ceballos' desk. Such spray did not work properly and, therefore, Ceballos reiterated her petition for a second spray. Paredes denied this second spray and both women visited Rivera's office. Here, Rivera informed Ceballos that there

---

[7] Ceballos denied DSUMF ¶¶ 41-42 using the declarations in her deposition: ECF No. 89-8, page 117, lines 13-20. It is thus contested the manner in which SAL granted her access to a parking inside the Judicial Center. Defendants suggest Quiñones asked attorney Alejandro Sanfeliú to give his space to Ceballos. DSUMF ¶¶ 41-42. Yet, Ceballos does not know if the new parking assigned to her belonged to Sanfeliú but does admit that she was assigned a parking in the Judicial Center. ECF No. 89-8, page 117, lines 13-20.

[8] The court has modified the DSUMFs in this section to incorporate Ceballos' qualifications and denials per her responses—located at ECF No. 106—which in turn reflect Ceballos' deposition testimony.

were no sprays left available and upon Ceballos insisting, Rivera then informed her that she had to ask Quiñones for a new spray.[9] DSUMF at ¶¶ 55-62.

The three women met with Hernández to report the spray situation and he asked each of them to write down their versions of the facts, to which Paredes complained that Ceballos (1) pushed her on the day of the spray incident, (2) harassed her on multiple occasions, and (3) that she could not handle Ceballos' treatment. DSUMF ¶¶ 63-65. ECF No. 89-19. Paredes also complained to Hernández that Ceballos pushed her on April 30, 2014 (same week as spray incident) when she was mopping the office, and asked Ceballos to stay away from the area, to which Ceballos allegedly walked to Paredes and stepped on her mop and grabbed her stick. DSUMF at ¶¶ 65-68. ECF No. 89-19.[10]

On June 30, 2014, Rentas issued a reprimand letter to Ceballos as a result of the events occurred on April 30, 2014 (spray incident with Paredes). DSUMF at ¶ 70. Rentas wrote that SAL had concluded that Ceballos had pushed Paredes and that her attitude towards Paredes was aggressive and recurring.[11] Yet, Rentas mentioned in the letter that

---

[9] The court has modified DSUMF ¶¶ 55-61 to incorporate Ceballos' qualifications and denials, which in turn reflect Ceballos' deposition testimony. Ceballos mostly admitted in part or with qualifications DSUMF ¶¶ 55-61. Consequently, the incident as to the petition of this second spray is rather murky and unclear. Nonetheless, as we will see, it stands contested whether in fact a second spray was denied because there were no sprays left, or because he simply did not want to give her another spray, and instead encouraged her to ask Quinones for one. See ECF No. 89-16, page 87, lines 22-25; and page 88, lines 1-4. In addition, Ceballos denied asking Rivera for a second spray in the first place; instead, she declared that it was Rivera who initially denied giving her anything. Most importantly, Ceballos denies DSUMF ¶ 62 noting in her response that "this incident reflects the treatment that Plaintiff was given by her supervisors...".

[10] As we will see from the record, Ceballos denies and disputes these facts, declaring that her treatment of Paredes was kind and that she did not push her. In addition, the court will not conclude whether in fact these incidents occurred. ECF No. 86-16 at page 84, lines 23-24. Note that we can conclude from the record that Hernández indeed received such complaints and letters (which in fact talk about these incidents), but to go as far as to certify such facts as undisputed, when they are based on affidavits subscribed by Hernández and Rivera, not by Paredes herself, would grant such affidavits the ability to introduce material that is of no personal knowledge to their declarants.

[11] The court notes Ceballos' qualification as to this DSUMF: "Defendants omitted that Rentas did not conduct an investigation as to the April 30, 2014 incident. Instead, he was made aware of it by conduct of Quinones". Plaintiff's response at ECF No. 106 ¶ 70 (citing ECF No 89-16 page 102, lines 15-22).

while the conduct was worthy of immediate termination, Rentas would apply a less sever

sanction (DSUMF at ¶¶ 72-74), simply requesting from Ceballos to meet the supervisors on

July 16, 2014 to resolve the dispute. DSUMF at ¶¶ 75-77. On July 16, 2014, Ceballos was part

of such meeting. Pérez, Ceballos, and Cobián were present during the meeting. DSUMF ¶¶

78-80. Ceballos was not suspended for that incident. DSUMF at ¶ 81.[12]

On August 22, 2014, Ceballos filed an internal complaint based on the spray incident

with Paredes and others, alleging in part that she was being discriminated by defamatory

remarks and complaints made by Rivera and Paredes against her. Furthermore, she alleged

unequal treatment on behalf of her supervisors, who ignored her the day of the incident with

Paredes and later told her that she had pushed Paredes. PSUMF ¶¶ 88-90; ECF 89-17, at

page 3. On September 9, 2014, Quiñones issued a letter stating that the Collective Bargaining

Agreement did not provide the proper mechanism to resolve this complaint and finding that

SAL's investigation did not justify taking action against Rivera. DSUMF at ¶ 92. ECF No. 89-

23. Ceballos petitioned Rentas to reevaluate, but it was dismissed for procedural reasons.

DSUMF at ¶¶ 93-94. ECF No. 89-25. On October 29, 2014, Ceballos responded to the

reprimand letter sent by Rentas on June 30, 2014. Ceballos denied the facts in the letter

from June 30, 2014, and instead argued she was the one being disrespected by her

supervisors. PSUMF at ¶ 82.

---

[12] The record is disputed as to what exactly happened in this meeting. While DSUMF ¶ 80 affirms that Ceballos began complaining at the meeting, Plaintiff denied such fact and instead reiterated that she was compelled to apologize to Paredes for allegedly pushing her. Ceballos further sustained in her response that she did not apologize because she did not push Paredes by any means. See ECF No. 106, PSUMF ¶ 80; ECF 106-1.

### Desk Cleanup Altercation and Subsequent Complaints[13]

On May 7, 2015, Ceballos requested her secretary, Magda Calderón, to inform office personnel that her desk needed cleaning, to which Quiñones overheard Calderón telling Hernández of Ceballos' request. DSUMF at ¶¶ 112, 114. As a result, Quiñones confronted Ceballos personally and asked what was wrong with her desk. PSUMF at ¶¶ 115-116. Ceballos reiterated that the desk was dirty, to which Quiñones expressed that it was not going to be cleaned and told Ceballos to clean it herself.[14] PSUMF at ¶¶ 117-120. Ceballos responded that she was not going to clean it as that was not part of her duties and that Quiñones should put this in writing. Quiñones said he would not do so; instead, that he would keep talking by mouth, "with his tongue". PSUMF at ¶ 122. In a later complaint, Ceballos described Quiñones' attitude as aggressive, invasive and full of screams, making her fear for her physical wellbeing. PSUMF at ¶¶ 121-124. ECF 89-33.

During the confrontation, Ceballos took out her cellular phone and began recording, to which Hernández then intervened and explained that the office had been cleaned that morning. PSUMF at ¶¶ 123, 124. Ceballos did not believe this because the desk was still greasy. Hernández told Ceballos to stop recording but Ceballos continued. DSUMF ¶ 126. ECF No. 89-33. After the event, Hernández told Ceballos to stop harassing Paredes. PSUMF at ¶ 127. On May 11, 2015, Ceballos filed an internal complaint against Quiñones based on this incident. In her complaint she explained she felt harassed, humiliated and intimidated

---

[13] The court has modified the DSUMFs in this section to incorporate Ceballos' qualifications and denials per her responses—located at ECF No. 106—, which in turn reflect Ceballos' deposition testimony.

[14] From the record stems no doubt as to the contents of this conversation, rather, the court has opposing views on how the conversation was handled by both parties. While Defendants' statement of facts attests to the contrary (based on Quiñones Summary of Incidents at ECF No. 89-34), Ceballos alleges that she kept a calmed tone and that it was Quiñones who first approached her in an aggressive attitude. Ceballos thus denies Defendants' proposed set of facts citing her own complaint against Quiñones and her deposition, which are located at ECF No 89-33, at page 2; ECF 89-16, page 160, lines 7-16 and 23-25.

by the aggressive conduct (reason why she recorded) of her supervisors. DSUMF ¶¶ 128-131; PSUMF at ¶¶ 122-124; ECF No. 89-33.[15]

On May 18, 2015, Ceballos filed a criminal complaint against Quiñones for disturbing the peace because of the May 7, 2015 incident. DSUMF at ¶ 132. After the police conducted their investigation, the complaint was dismissed. ECF No. 89-35. After the complaint, her supervisors concluded that all of Ceballos' future administrative issues were to be handled by and through Hernández. DSUMF at ¶¶ 136-137.

### Case Assignment and Interview Quotas

SAL attorneys are assigned days in which they interview new criminal defendants. On September 30, 2014, Hernández received an email from Ceballos notifying him that she would not be present in upcoming interviews because she had a jury trial. PSUMF at ¶ 108. ECF No. 89-31. Hernández replied that she was not fulfilling her quota regularly and that this was a recurring problem of hers, which caused other attorneys to complain because it meant they were affected in their work. DSUMF at ¶ 109. ECF No. 89-31. On January 27, 2015, Hernández emailed Ceballos again informing that other attorneys had complained because she was arriving late to interviews and warning her that she failed to meet her quota that month. DSUMF at ¶¶ 106, 107; 110-111. ECF No. 89-32.[16]

---

[15] The court notes that DSUMF 129-132 are either denied or qualified by Ceballos. In her responses, Plaintiff alleges that Defendants omitted to note that Ceballos also stated in her complaint she: (1) feared for her life, health, personal safety and integrity; (2) was extremely humiliated; (3) received undeserved treatment; and (4) was stalked and intimidated by Quinones' and Hernández' violence and aggressiveness." In addition, that the complaint was based, in part, on unequal treatment. ECF 89-33, at page 1 and 2. The court, after reviewing the complaint, agrees with Ceballos. See PSUMF ¶¶ 129-132, at ECF No. 106.

[16] Plaintiff's response, at ECF No. 106, ¶ 110 and ¶ 111, denies this in part while claiming hearsay violations. In specific, Ceballos contends, citing her deposition, that: "the conferences with inmates were one of the situations in which Defendants treated Plaintiff differently from her male counterparts. Defendants insisted on Plaintiff arriving at a certain hour, whereas her male counterparts were not. Counsel Abreu was one of the most benefited parties to this dual treatment; he was even allowed to sign his absences afterwards and have no negative balances." ECF No. 106, at ¶¶ 110-111.

SAL has norms as to the circumstances in which a case can be reassigned.[17] Quiñones made decisions as to how criminal cases were assigned. DSUMF at ¶¶ 208-209. Yet, sometimes Ceballos would write "reassign" on a file and hand it over to Quiñones and he would return the file to her. Ceballos alleged that Quiñones did so without consideration of the internal regulations. DSUMF at ¶¶ 210, 212. This allegedly resulted in her having sometimes more cases than her peers and being treated in a different manner. SUMF at ¶¶ 216-217.[18]

### **Discrimination Charge (Puerto Rico Department of Labor "DOL")**

On May 26, 2015, Ceballos filed a Complaint against Quiñones, Rentas and Cobián for discrimination based on sex and national origin before the DOL. DSUMF at ¶¶ 140-141. ECF No. 89-37. On June 29, 2015, Ceballos tried to hand Quiñones a memo, but Quiñones abruptly replied that all her matters should be addressed through Hernández. DSUMF at ¶ 142. That same day she wrote a letter to Rentas complaining about the incident with Quiñones and the memorandum. DSUMF at ¶ 143. ECF No. 89-38. In the letter, even though Ceballos did not allege discrimination or unequal treatment against Quiñones, she mentioned that he treated her aggressively and disrespectfully. PSUMF at ¶ 144. On April 4, 2016, Ceballos amended the May 26, 2015 complaint to add a retaliation claim because SAL had withheld payments due to low balance in vacation leave days and because her

---

[17] Ceballos further qualifies her response to DSUMF ¶ 210 stating: "Defendants omit that Quinones sent her cases back, in violation of the regulation..." Plaintiff's Deposition ECF No. 89-8 at page 90, lines 4-9.

[18] Ceballos is unsure of how many times this happened or if other attorneys had two sex cases at once. In addition, Ceballos contends in her response that these cases were known to be more complex, and that Abreu had none while she had more than two. See DSUMF at ¶¶ 218-219; Ceballos' Deposition ECF No. 89-16 at page 104, lines 5-19; and page 105, lines 1-17; and page 153, lines 23-25.

supervisors had allegedly rearranged her calendar to cause certain scheduling conflicts as to her administrative proceedings.[19] PSUMF at ¶¶ 146-147.

## Reasonable Accommodation Request and EEOC Charge

On December 13, 2016, Ceballos requested a flexible work schedule accommodation. DSUMF at 149. As a result, SAL referred Ceballos for a medical evaluation to evaluate Ceballos' request. DSUMF at ¶ 150. Before a decision was made on the request, Ceballos filed a Discrimination Charge at the Equal Employment Opportunity Commission ("EEOC") alleging that the accommodation had not been granted due to unequal treatment reasons. DSUMF at ¶ 151. Having the parties subsequently agreed on the terms of the accommodation and, in fact, conceding the accommodation, the EEOC decided not to take further action and dismissed the charge. DSUMF ¶¶ 152-153.

## Absences and Direct Deposit Suspensions[20]

During her stay at SAL Bayamón, Ceballos' direct deposit payments were suspended on three occasions because of alleged negative balance in her leave days. In 2014, for example, Ceballos was absent 77 of the 260 working days of the year.[21] Because of this, on March 20, 2015, Cobián wrote a letter to Ceballos notifying her that her direct deposits would be suspended until the negative balances were accommodated. PSUMF ¶¶ 154-159. ECF No.

---

[19] These remarks will be further analyzed in detail by this court, though for now we anticipate that the evidence presented by Ceballos fails to satisfy all of the retaliation elements.

[20] In response to these proposed facts, Plaintiff relies on testimony stating that other attorneys were permitted to sign their absences afterwards in order for them to have no negative balances, and that her absences were due to the hostile environment created by her supervisors. PSUMF at ¶¶ 154-161. While Ceballos' testimony does not deny or controvert these proposed facts listed by Defendants, it does yield further questions on, for example, whether other attorneys were granted certain benefits and she was not. This evokes further inquiry on triable facts that are material for purposes of adjudicating Ceballos' claims.

[21] There is contesting as to whether this was below the level of attendance of all other SAL attorneys, as proposed by DSUMF ¶ 156. Again, Ceballos denied this and cited testimony as to the fact that other attorneys who belonged to the Boys Club were allowed to sign absence sheets retroactively thus not having negative balances and not being penalized. See ECF No. 89-8, page 127, lines 21-23; ECF No. 89-16, page 154, lines 23-27.

89-46.[22] This decision was made by Cobián. DSUMF ¶ 160. On October 9, 2015, Ceballos

sent a letter to Cobián in which she complained about the decision, to which Cobián

responded stating that the suspension was made so that no excess payments were made.

DSUMF at ¶¶ 162-163. ECF No. 89-45, 89-47. On December 29, 2015, SAL approved rules

for Direct Deposit. ECF No. 89-48. Accordingly, SAL may suspend payments due to an

employee's insufficient balance. DSUMF at ¶¶ 165-168.

On January 8, 2016, Ceballos' direct deposits were reactivated although she still had

a negative balance on her vacation leave days. DSUMF at ¶ 169. On May 3, 2017, Ceballos

was notified that because she had a balance of minus 12 vacation leave and sick leave days,

her direct deposit would be suspended again. ECF No. 89-49, 89-50. DSUMF at ¶ 172. On

September 29, 2017, the suspension was lifted. Again, on June 8, 2018, the suspension was

applied as Ceballos had a misbalance of leave days. Other employees, such as Iris Maldonado

in 2011 and Barbara Díaz in 2018, have had their direct deposits suspended for excessive

absences. DSUMF ¶¶ 176-182.

### Related Discriminatory and Retaliatory Events Pursuant to Ceballos' Testimony[23]

On February 3, 2017, Ceballos complained to Vélez saying that on January 26, 2017,

secretary Tania Santana had called Ceballos "puerca" (Spanish for "pig"). DSUMF at ¶ 200.

On May 26, 2017, Santana was reprimanded by Vélez. DSUMF at ¶ 201. Ceballos further

alleged that Joannie Ramos that same day went into her office and, in an aggressive manner,

---

[22] The court has modified DSUMF ¶¶ 154-159 to incorporate Ceballos' qualifications and denials, which in turn reflect Ceballos' deposition testimony.

[23] The following comprises a list of remarks made by Ceballos in her deposition and responses to Defendants' Statements of Uncontested Material Facts, which in turn relate to discriminatory conduct by her supervisors and coworkers. However, the court notes that these are scattered incidents alleged by Ceballos in a general manner. For such, they stand currently in dispute and we cannot take them as granted. Nonetheless, with or without these remarks on record, our conclusion would be the same.

asked her for a case file and banged on the door. DSUMF at ¶ 202. ECF No. 89-52 – 89-55. Per Ceballos deposition, at some point during her stay at SAL, Quiñones told her that she was treated the way she was because she was a Dominican but never called Ceballos a "Dominican". PSUMF at ¶ 220; ECF No. 89-16, pages 54 and 55, lines 21-25 and 2-7, respectively. However, Hernández never called Ceballos "the Dominican" or "the foreigner". SUMF at ¶ 222. Neither did Cobián. SUMF at ¶ 223. According to Ceballos' deposition, on 2004, she overheard several secretaries referring to Ceballos as "la negra" (Spanish for "the black"), and that in 2006 Rentas said that Ceballos was "brownnose" and that Dominicans were servile. DSUMF at ¶¶ 224, 227. Furthermore, since attorney Alejandro Sanfeliú started working in SAL in 2005, he called her "the Dominican". Ceballos never complained about Sanfeliú calling her "the Dominican" DSUMF at ¶¶ 228-230. Secretary Lizette Meléndez allegedly called her the Dominican several times but Ceballos only mentioned this to her supervisors in 2005-2006. DSUMF ¶¶ 231-234. Also, per Ceballos' deposition, Sanfeliú constantly talked about sex and Dominican women. DSUMF at ¶ 240.[24]

## IV.   DISCUSSION

### A. Statute of Limitations for Title VII Claims

At the outset, this court must address the timeliness of Plaintiff's Title VII claims. Defendants argue that Ceballos' claims constitute "discrete acts" and that "all discrete acts of discrimination that occurred outside the 300-day limitations period, that is before July 30, 2014, are time barred". This is erroneous because this case is not based on discrete acts and, as we will see, meets the definition of the continuing violation doctrine.

---

[24] Whether Ceballos never complained specifically about sex-based remarks or Dominican commentaries made by Sanfeliú or any other person in SAL Bayamón, as proposed by DSUMF at ¶¶ 238-239, 244, stands disputed and in doubt by the reflection of Ceballos' testimony. See Plaintiff's Deposition at ECF No. 89-16, page 43, lines 13-19; and ECF No. 89-53, 89-54.

A Title VII plaintiff must file a charge with the EEOC within either 180 or 300 days after the "alleged unlawful employment practice occurred." 42 U.S.C. § 2000e–5(e)(1). Puerto Rico is a deferral jurisdiction, and so an employee must file the charge within 300 days of the alleged unlawful conduct if she first files a charge with the Puerto Rico Department of Labor; otherwise, the charge must be filed within 180 days. Frederique–Alexandre v. Dep't of Nat. & Envtl. Res. P.R., 478 F.3d 433, 437 (1st Cir.2007).

"The continuing violation doctrine 'is an equitable exception that allows an employee to seek damages for otherwise time-barred allegations if they are deemed part of an ongoing series of discriminatory acts and there is some violation within the statute of limitations period that anchors the earlier claims.'" Loubriel v. Fondo del Seguro del Estado, 694 F.3d 139, 144 (1st Cir.2012) (citing O'Rourke, 235 F.3d at 730; Cordero–Suárez, 689 F.3d at 83 (1st Cir.2012)). "Such tolling is an equitable means of ensuring that meritorious discrimination claims are not pretermitted because the claimant needed to experience a pattern of repeated acts before she could be expected to realize that the individual acts were discriminatory in nature." Loubriel, 694 F.3d at 144 (citing Thomas v. Eastman Kodak Co., 183 F.3d 38, 54 (1st Cir.1999)).

In a Title VII claim, "discrete acts" are different from hostile work environment claims. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002). Discrete acts such as "termination, failure to promote, denial of transfer, or refusal to hire are easy to identify". AMTRAK v. Morgan, 536 U.S. 101, 114 (2002). Hostile work environment claims generally "do not turn on single acts but on an aggregation of hostile acts extending over a period of time." Marrero v. Goya of P.R., Inc., 304 F.3d 7, 18 (1st Cir. 2002) (quoting Havercombe v. Dep't of Educ., 250 F.3d 1, 6 (1st Cir. 2001). In such scenarios, "consideration

of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." Id., at 117, 122. Ceballos would be allowed to proceed on a hostile environment claim as "long as all acts which constitute the claim are part of the same unlawful practice and at least one act falls within the time period." AMTRAK, 536 U.S. at 122.

Here, Ceballos filed suit based on Title VII discrimination and its hostile environment provisions on November 7, 2016. Such suit contained allegations related to events allegedly occurred as early as 2008 and as late as 2017. From the record, it is safe to say that most, if not all, of these events are related to apparent discriminatory conduct or hostility. Hence, this is not a matter related to discrete acts, contrary to what Defendants argue. In fact, it is evident from the record that Ceballos attempts to establish basis for one continuous set of events. As a result, the moment in which Ceballos filed her administrative charge before the local DOL is inconsequential as to whether the hostile environment claim is time-barred. The same can be said as to the EEOC charge.

Furthermore, Defendants incorrectly argue that since the continuing violation doctrine does not apply to discrete acts of alleged discrimination, many of Ceballos' alleged discriminatory events should be discarded. Specifically, those that occurred prior to the 300 days before May 26, 2015, when she filed the local DOL charge. Nonetheless, the record attests to the contrary. This is a hostile environment case based on the continuing violation doctrine because the events illustrated extend over a long period of time (at least from 2008-2016) and substantially relate to each other.[25] As a result, what is essential is whether there

---

[25] Specifically, at the very least the following incidents stem from Ceballos' deposition: (1) in 2012 (and

is proof of events related to the unlawful practice alleged by Ceballos in different moments of time and not as simple-isolated instances, and whether at least one of them (the anchoring act) is substantially related to an untimely act, and its subject matter sufficiently similar to that of the untimely act.[26] Thus, the incidents described in the factual background form Ceballos' hostile work environment claim. Most importantly, they are not time-barred because they are "sufficiently related" to at least one anchoring event in 2016, year the complaint was filed. Noviello, 398 F.3d at 86.[27]

## B. Title VII Hostile Work Environment

Title VII, which prohibits discrimination because of sex and nationality, provides "that '[i]t shall be an unlawful employment practice for an employer … to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." Oncale v. Sundower Offshore Servs., Inc., 523 U.S. 75, 78 (1998) (citing 42 U.S.C. § 2000e–2(a)(1)).) "There are various types of actionable sexual harassment claims under Title VII:

---

sometime before), she was denied proper parking space, to which she alleges discrimination based on sex and nationality; (2) in 2014, Ceballos had an incident with Rivera and Paredes because they denied her petition for a new spray; (3) in 2015, Ceballos had an altercation with Quinones in relation to the apparent denial to clean her desk, leading up to aggressive behavior between them; (4) in 2016, Ceballos had another altercation—this time with Hernández—, leading to hostility between the two; (5) and for an uncertain amount of times, Ceballos was reassigned cases when she asked for another attorney to handle them.

[26] Therefore, "[f]or the continuing violation doctrine to apply, **[Plaintiff]** needs to establish that a discriminatory 'anchoring act' occurred within the limitations period." Lockridge v. The University Of Maine System, 597 F.3d 464, 474 (1st Cir.2010) (citing Noviello v. City of Boston, 398 F.3d 76, 86 (1st Cir.2005)). "**To qualify as an anchoring act, the discriminatory act must 'substantially relate[ ] to [the] earlier incidents of abuse**.'" Lockridge, 597 F.3d at 474 (internal citations omitted) (emphasis added). "In *O'Rourke,* [the First Circuit Court of Appeals] explained that a court, **when ascertaining whether an anchoring act is 'substantially related' to an untimely act, should ask if the subject matter of the anchoring act is 'sufficiently similar' to that of the untimely act**." Lockridge, 597 F.3d at 474 n. 7 (citing O'Rourke, 235 F.3d at 731) (emphasis added).

[27] "Because hostile work environment claims do not turn on single acts but on an aggregation of hostile acts extending over a period of time, … the applicable statute of limitations will not exclude acts that are part of the same unlawful employment practice if at least one act falls within the time period." Cordero–Suárez, 689 F.3d at 82.

hostile work environment claims, *quid pro quo* harassment claims and retaliation claims."
Perez v. Developers Diversified Realty Corp., 904 F.Supp.2d 156, 163 (D.P.R. 2012) (*citing*
Valentin–Almeyda v. Municipality of Aguadilla, 447 F.3d 85, 94 (1st Cir.2006)). In the case
at hand, Plaintiff complains of hostile work environment and retaliation, both on the basis
of sex and national origin discrimination.

The hostile work environment framework under Title VII stands for "[1] [u]nwelcome
sexual advances, [2] requests for sexual favors, and [3] other verbal or physical conduct of a
sexual nature constitute sexual harassment … ." 29 C.F.R. § 1604.11 (2010). "One type of
sexual harassment … involves 'bothersome attentions or sexual remarks' so 'severe or
pervasive' that they create a 'hostile work environment.'" Medina-Rivera, 713 F.3d at 136
(internal citations omitted). Furthermore, a hostile work environment claim exists if a
"workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is
'sufficiently severe or pervasive to alter the conditions of the victim's employment and create
an abusive working environment.'" Harris v. Forklift Sys., 510 U.S. 17, 21 (1993) (*quoting*
Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986)). The pattern of conduct
complained of must be "(1) characterized by intimidation, ridicule and insult, not just minor
unpleasantness or criticism, (2) offensive to the complaint precisely because of her
membership in a protected class, and (3) sufficiently burdensome to materially alter the
conditions of the complaint's employment." White v. N.H. Dep't of Corr., 221 F.3d 254, 259-
60 (1st Cir. 2000).

Plaintiff may establish a violation of Title VII by proving that discrimination based on
*sex or nationality* has created a hostile work environment. Forrest v. Brinker Intern. Payroll

Co., LP, 511 F.3d 225, 228 (1st Cir. 2007); Torres-Negron v. Merck & Co., Inc., 488 F3d 34,

39 (1st Cir. 2007). The key elements of a hostile work environment claim are:

> (1) the plaintiff belongs to a protected group; (2) she was subject to unwelcome
> sexual [unwelcome] harassment; (3) the harassment was based on her sex [or
> nationality]; (4) the harassment was sufficiently severe or pervasive to alter
> the conditions of employment and create a discriminatorily-abusive work
> environment; (5) the complained-of conduct was both objectively and
> subjectively offensive; and (6) there is a basis for employer liability. Medina-
> Rivera, 713 F.3d at 137 n. 2. Agusty–Reyes v. Dep't. of Educ. of P.R., 601 F.3d
> 45, 53, n. 6 (1st Cir. 2010).

Likewise, in analyzing Plaintiff's claims based on both sex and nationality, this court

will evaluate them together. See O'Rourke, 235 F.3d at 730. While the evidence presented

leaves no doubt as to the satisfaction of two of these elements—(1) and (6)—it does yield

uncertainty as to various triable issues which prevent this court from dismissing the case. As

we will discuss, such triable issues will need to be resolved by a reasonable jury for it to

determine whether the elements are ultimately satisfied.

Here, Defendants contend that the alleged discriminatory events pointed out by

Ceballos relate "to personality conflicts, slights, tempers, and other factors common to the

workplace", such as altercations regarding paper towels, lunches, cleaning sprays and

parking spots, among others. ECF No. 90, page 1. Most importantly, Defendants allege "the

evidence shows that the events lack any relationship to Plaintiff's sex or national origin". Id.

This court understands such appreciation to be simplistic and incorrect because, as we will

see, the record does not reflect with certainty a total lack of relationship between Ceballos'

sex or national origin and Defendants' conduct. Consequently, the uncontested evidence on

file is not enough to warrant dismissal.

Perhaps most importantly, the reasons for some of the conduct, the factual

circumstances in which certain events took place, and the treatment as to other workers of

SAL Bayamón are still unclear from the record. In this sense, Ceballos' deposition highlights controverted events that could see a reasonable jury resolve them in her favor. Such factual determinations require a subjective analysis for which a factfinder is better situated to resolve. See Mulero-Rodriguez, v. Ponte, Inc., 98 F.3d 670, 677 (1st Cir. 1996); Cherkaoui, 877 F.3d at 23-24 (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). This is because, at this stage there is "no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, [and] no room for the judge to superimpose his own ideas of probability and likelihood…." Greenburg v. Puerto Rico Mar. Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987).

First, the record sparks doubt as to SAL's parking distribution, the assignment norm itself, and whether attorneys who had less years than Ceballos at SAL were indeed assigned parking spaces inside the Judicial Center while she was denied such benefit. In her deposition, Ceballos declared that she was denied proper parking space by her supervisors, presumably years before the Municipality of Bayamón limited her parking use. ECF No. 89-8, page 114, lines 23-25, and page 115, lines 1-7. The reason for such denial is unclear from the record. Furthermore, Ceballos declared that only after sending two letters to her supervisors, was she allowed to park inside the Judicial Center. Id., page 115, lines 2, 8-25. Most worryingly, however, is the fact that Ceballos declared that less-senior attorneys such as Alejandra Verna had SAL parking while she did not. Id., page 116, lines 1-8, and page 117, lines 10-13. See also Plaintiff's Affidavit, ECF No. 106-1, ¶¶ 3-4 (where Ceballos specifies which attorneys of lesser seniority had parking spaces).

Second, the court highlights the spray incident involving Ceballos, Paredes and Rivera. The record shows that on April 30, 2014, Ceballos asked Paredes to provide her with

a cleaning spray. After trying the first spray, Ceballos asked for a second, but Paredes told Ceballos she had to ask Rivera for it. While the court is certain that Paredes and Ceballos had a verbal disagreement over whether a new spray could be given to Ceballos, and that both opted to visit Rivera in order to resolve this dispute, the court is not clear on the actual reason for denying the spray, much less in the way the altercation took place. According to Ceballos' testimony, Rivera denied her the use of another spray by saying there were no other sprays. Nevertheless, upon Ceballos insisting, Rivera appeared unwilling to give her any spray at all, denying thus the petition and telling Ceballos to ask Quiñones herself. ECF No. 89-16, page 84, lines 1-8; page 87, lines 17-25; page 88, lines 3-11. Again, there is factual doubt as to whether Rivera simply denied giving another spray to Ceballos, or if SAL Bayamón lacked more sprays at all.

In addition, it is unclear whether Rivera and Paredes mistreated Ceballos in some way as part of the spray incident, or if Ceballos instead was the one that treated them aggressively. ECF No. 89-20; ECF No. 89-16, page 102 and 104, lines 15-22 and 6-19, respectively. Even worse, while Defendants presented affidavits and letters reflecting that Ceballos had pushed Paredes the day of the incident, Ceballos' deposition always reflected the contrary. ECF No. 89-16, page 84, lines 23-24. In fact, Ceballos declares that she was ignored by her supervisors during that week, as if they were evading her because of the spray incident, and that it was Paredes who got upset. ECF No. 89-16, page 88, lines 17-19; page 104, lines 6-10. In addition, there are conflicting versions as to whether that week Paredes was pushed and assaulted by Ceballos. See ECF No. 89-4; 89-18; 89-19. See also ECF No. 89-16, page 18, lines 22-24, and page 84, lines 23-24; and ECF No. 106-1, ¶ 5-6.

Third, in 2015 Quiñones questioned Ceballos after she asked for her desk to be cleaned one afternoon. Quiñones refused to order Paredes to clean Ceballos' desk and instead explained why it would not be cleaned. There are substantial doubts as to the *manner, motivation and general aspects* of the remarks expressed by both Quiñones and Ceballos during this disagreement. While Quiñones mentioned during the event that the desk was already cleaned by Paredes, Ceballos declared—in both her deposition and an internal complaint she later filed against Quinones—that she did not believe this to be true because the desk was greasy and dirty. Plaintiff's Deposition, ECF No. 89-16, pages 160 and 163, lines, 23-25 and 12-14, respectively; ECF No. 89-33, page 2. Most importantly, while Ceballos alleged her tone was calmed, and that it was Quiñones who first approached her in an aggressive and invasive manner to the point he had her backed against the wall, Quiñones contends the contrary, that is, that Ceballos was screaming aggressively. Id.; ECF No. 89-16, page 162, lines 13-21. Moreover, Ceballos declared having feared Quinones' attitude, reason for which she took out her cellphone and recorded Quinones. Furthermore, there is conflict as to whether Quiñones in fact told Ceballos to clean the desk herself. ECF No. 89-16, page 160, lines 21-25.[28]

Fourth, Ceballos contends she was reassigned cases after asking for them to be transferred to other attorneys, supposedly violating SAL's internal norms. ECF No. 89-8, page 104, lines 5-25. While such employee action *may* fall under the discretion of the employer's management, this court notes that Ceballos' testimony specifically points toward the fact that other attorneys in analogous positions were not distributed cases in the way

---

[28] The court also notes that a criminal complaint was filed by Ceballos on the basis of Quiñones' apparent aggressive and assaulting attitude. Specifically, Ceballos alleged that Quiñones breached Ceballos' intimacy and Ceballos thus feared for her safety, reason by which she took out her cellphone. ECF No. 89-35. Again, the content of such remarks stands contested.

Ceballos was. ECF No. 89-8, page 109 and 110, lines 1-25 and 3-12, respectively. Similarly, there is factual dispute over whether other attorneys had the same number of sex cases as Ceballos had at once, thus causing her to have more caseload than other attorneys, such as Fernando Abreu. ECF No. 89-8, page 105, lines 2-17. On the contrary, Defendants have presented various emails sent by fellow attorneys complaining that Ceballos was not complying with her case load and quotas. ECF No. 89-4; ECF No. 89-31. As to the content of such documents, Ceballos disputes whether she had a lower balance than other SAL attorneys who were never complained against. ECF No. 89-8, page 127, lines 21-23, ECF No. 89-16, pages 154 and 155, lines 23-25 and 1-9 respectively. At this juncture, Defendants have not placed the court in a position to accept the contents of such complaints as true because of hearsay considerations. It is thus unclear if Ceballos indeed complied satisfactory with case quotas and whether other attorneys had more cases at any given time, or if they were treated the same way in relation to the reassignment of cases.

Finally, the record reflects conflict over whether other attorneys were permitted to sign attendance sheets retroactively to conserve their leaves. Note that the evidence provided sustains that Ceballos' direct deposit was suspended various times because of leave deficit. However, Ceballos contended that no deposit suspension was made to other male attorneys who were supposedly part of the Boys Club. In response, Defendants' merely contended that Iris Maldonado and Barbara Díaz were suspended their direct deposits as well. Nonetheless, no direct evidence (such as time sheets, attendance sheets, etc.) as to the balance and suspension of other attorneys was presented. For such, there is doubt as to whether Ceballos was indeed treated differently because, for example, other attorneys benefited from retroactively signing their attendance sheets and thus were never penalized, which is a

contested fact. ECF No. 89-8, page 127, lines 21-23; ECF No. 89-16, pages 154 and 155, lines 23-25 and 1-9, respectively.

On a separate note, Defendants argue that Ceballos does not satisfy the disparate treatment threshold required under Title VII. In specific, that Ceballos failed to present evidence of an adverse employment action. As reflected by the record, this is incorrect. An adverse action is defined, as cited by Defendants themselves, as an act that must "materially change the conditions of the plaintiff's employment". Gu v. Boston Police Dep't, 312 F.3d 6, 14 (1st Cir. 2002). Adverse acts "typically involve discrete changes in the terms of employment, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." Cham v. Station Operators, Inc., 685 F.3d 87, 94 (1st Cir. 2012).

Contrary to what Defendants argue, and as previously discussed, the evidentiary record illustrates several factual events that could very well be considered adverse actions. In fact, all the factual issues previously mentioned, if decided in favor of Ceballos, would reasonably and potentially signify a change in Ceballos' work conditions, benefits, and/or treatment. The court acknowledges that minor disruptions in the workplace, such as "petty slights, minor annoyances, and simple lack of good manners," fail to qualify. Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53 at 68 (2006). Yet, when the record is seen as a whole, this court has no doubt that Ceballos has indeed presented enough evidence for a juror to potentially conclude that Defendants have taken substantially adverse actions against her. Ultimately though, it would be up to the trier of fact to, considering the above factual background, determine whether such events caused Ceballos a substantial change in material conditions and harmed her in some way. See Burlington Indus., Inc., 524 U.S. at

761; Gu v. Boston Police Dep't, 312 F.3d 6, 14 (1st Cir.2002); Marrero v. Goya of P.R., Inc., 304 F.3d 7, 23 (1st Cir.2002).

Similarly, Plaintiff contends that the Motion for Summary Judgment should be denied because there are jury issues as to "the comments and workplace situations regarding Plaintiff's national origin and sex, and sufficient facts at this stage to support the conclusion that defendants knew or should have known about it and failed to take immediate and corrective action to deal with it". ECF No. 105, at page 11. More specifically, Ceballos contends that "being continuously mistreated and called by SAL's management and personnel *la dominicana puerca, la negra, la extranjera*", and "being told that Dominicans are brown-nosers, *brutos*", among other sexual or nationality-based remarks "do not constitute mere office quarrels but pervasive and severe work environment for which defendants are liable and warrant taking this case to trial". ECF No. 105, at page 11. The court agrees but clarifies that this does not mean that Defendants are liable under Title VII and its hostile work environment provisions. Note that, the court merely concludes that there are enough issues of fact to warrant denial of the motion for summary judgment, yet enough apparent evidence for a trier of fact to reasonably conclude (after a trial) whether there existed a hostile environment. See, for example, ECF No. 89-8, pages 130, 136, 137, 139; lines 1-4, 8-24, 21-25, 1-11, 13-18, respectively; ECF No. 89-16, page 105, lines 7-17. In reaching this conclusion, the court reminds that "evidence of sexual remarks, innuendos, ridicule, and intimidation may be sufficient to support a jury verdict for a hostile work environment." O'Rourke, 235 F.3d at 729. See also Faragher v. City of Boca Raton, 524 U.S. 775 (1998).

Finally, it is essential to highlight that Ceballos declared that Quiñones told her twice she was being treated that way because she was a Dominican. ECF No. 89-16, page 153, lines

13-23; ECF No. 89-16, page 55, lines 2-7. This is not to be taken lightly as it sheds light into the potential animus of Defendants and the knowledge of Ceballos' supervisors. See Lipsett, 864 F.2D 881 at 895 (if a non-movant such as Ceballos provides "names, dates, incidents and supporting testimony [that may] give rise to an inference of discriminatory animus, the dispute must be subjected to the fact finding process"). Furthermore, the court reiterates that, as is common in cases involving complex issues of credibility, verbal testimony, motivation and subjective reasoning and analysis, it is difficult to adjudicate this type of case based solely on a summary judgment record. For such, the proper way to resolve the trial-worthy issues herein discussed is for a trier of fact to entertain the evidence.[29]

The Motion for Summary Judgment as for the Title VII sex and nationality discrimination claim, predicated on hostile environment, is hereby **DENIED** as to SAL. As to the individual liability of each codefendant—Cobián, Vélez, Quiñones, Rentas, and Hernández—this court **GRANTS** the Motion for Summary Judgment. It is known that there is no individual employee liability under Title VII, only employer. Fantini v. Salem State Coll., 557 F.3d 22, 31 (1st Cir. 2009).

### C. Title VII Retaliation

Title VII makes it unlawful for an employer to retaliate against a person who complains about discriminatory employment practices:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees … because he has opposed any practice made an unlawful employment practice by

---

[29] Defendants are incorrect in arguing that Plaintiff "failed to prove that her supervisors created an actionable hostile environment based on her Dominican nationality or gender." It is apparent from the evidence on record that Ceballos' supervisors knew about the conduct she alleges to be subject of this complaint. This court thus denies Defendants' argument. Note that, an "employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998). However, if a co-worker created the hostile work environment, the employer will be held liable only if it was negligent either in discovering or remedying the harassment. Torres Negron v. Merck & Co., Inc., 488 F.3d 34, 40 (1st Cir. 2007).

> this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter. <u>42 U.S.C. § 2000e−3 (a)</u>.

To succeed on a retaliation claim, a plaintiff must first prove these elements: (1) that she undertook protected conduct; (2) that her employer took a material adverse action against her; and, (3) that a *causal nexus* exists between elements one and two. <u>See Medina-Rivera</u>, 713 F.3d at 139 (internal citations omitted). Because Ceballos fails to provide enough evidence to demonstrate how the alleged retaliatory acts employed against her constitute adversity, or relate to her protected conduct, this court has no other option than to **GRANT** Defendants' motion as to the retaliation claim presented.

"[S]ubjecting a party to a hostile work environment in retaliation for protected activity may be actionable under … Title VII … ." <u>Noviello</u>, 398 F.3d at 91-92. Furthermore, protected conduct under Title VII "is not limited to filing an administrative charge of discrimination. It expressly prohibits retaliation for 'oppos[ing] any practice made an unlawful practice' by Title VII." <u>Petrarca v. Southern Union Co.</u>, No. 04−310S, 2007 WL 547690 at *12 (D.R.I. 2007) (*citing* 42 U.S.C. § 2000e−3(a)). <u>See Perez-Cordero v. Wal-Mart Puerto Rico, Inc.</u>, 656 F.3d 19, 31 (1st Cir. 2011). Note that "[t]he antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm. … In our view, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, "which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" <u>Burlington Northern and Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 67-68 (2006) (citation omitted).

Here, while we agree that Ceballos engaged in protected conduct—the record reflects so—, most of the alleged retaliatory events do not constitute adverse actions under the antiretaliation provisions of Title VII. Most importantly, even if Ceballos would prove that each alleged retaliatory action materially affected her, the third element of the prima facie test, causation, is missing as to all alleged retaliatory events. This is because Plaintiff must provide enough factual evidence to demonstrate that the alleged retaliatory conduct (i.e. salary suspension, reassignment of cases and conferences, reprimands, etc.) was done exclusively as a result of Ceballos' protected conduct. As we will discuss, from the evidence presented, no reasonable factfinder would conclude that there exists a direct relation between the employment action and the protected conduct.

Ceballos first demonstrate that Defendants reprimanded her by letter several times because of her incidents. Such reprimands happened after she complained about the discriminatory conduct of her coworkers. However, the record illustrates that not one of the letters affected Ceballos substantially other than warning Ceballos of her improper conduct.[30] Hence a reasonable factfinder would deem the second retaliatory element as unsatisfied. For such we deem it unnecessary to analyze if retaliatory causation is present. But even if we did, we will discuss why retaliatory causation is missing from the entire record. Furthermore, the court concludes the same as to two other alleged retaliatory actions. In specific, Ceballos contends that her coworkers knew and talked about the complaints she had filed before the administrative forums. This alone is not enough to prove

---

[30] Note that an adverse action for purposes of the antiretaliation provisions, contrary to a hostile environment claim, is a conduct carried out by the employer that would have dissuaded a reasonable worker from making or supporting a charge of discrimination. This is what the Court has referred to as being materially adverse or harmful in this context. Burlington Northern and Santa Fe Ry. Co., 548 U.S. at 55. The reprimand letters in no way fit this definition.

an adverse action was taken, particularly when nothing in the record suggests that Ceballos was in some way dissuaded from further engaging in protected actions.

Ceballos also alleges that there was a moment when the State Insurance Fund ordered her to rest at home and that she had to be absent from SAL Bayamón. Nonetheless, that management postponed her cases instead of having someone substitute her, as was usually done. This contention alone is insufficient to convince a reasonable juror that retaliation took place. Note that Ceballos expresses that the practice in SAL Bayamón was different and that usually cases were given to another attorney while another was absent. Thus, that she was treated "differently". ECF No. 89-8, page 65 and 66, lines 24-25 and 3-8, respectively. While this may spark doubts over whether she was discriminated under Title VII, it would be inappropriate to use this statement alone to conclude a retaliatory act was carried out against her. Note that it would seem unreasonable for a juror to infer that adversity is caused to an employee whenever his duties are postponed until she recovers. In any case, the postponement of the cases worked in Ceballos' favor as she would be able to comply with the hearings later. In addition, the court will not entertain logical jumps or general conclusions introduced by the Plaintiff in her remarks. Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir.2017) (quoting Pina v. Children's Place, 740 F.3d 785, 795 (1st Cir.2014)).

As to the cleaning incidents involving Ceballos, Rivera and Paredes, the record does not demonstrate how failure to provide paper towels, sprays or proper desk cleanup would be connected in some way to having complained against SAL or her coworkers in any possible form. Again, the most a reasonable factfinder could infer from the evidence provided is that such employment action was related to a potential discriminatory and hostile work environment. Yet, nothing in the record ties such actions to the fact that

Ceballos complained against some of her supervisors or coworkers. Note as well that chronological proximity alone does not establish causality on a retaliation claim under Title VII, **particularly if the larger picture undercuts any claim of causation.** Wright v. CompUSA, 352 F.3d 472, 478 (1st Cir.2003) (emphasis added).

Additionally, for Ceballos to prove her retaliation claim she needs to present proof that the retaliation would not have occurred in the absence of the alleged protected conduct. In other words, that the desire to retaliate was the but-for-cause of the employment action. University of Texas Southwestern Medical Center v. Nassar, 570 US 338, 352 (2013). It is not enough to make conclusory allegations or to declare that the employer took certain adverse actions time *after* Plaintiff complained to establish causation. Other than such temporal proximity, the court finds nothing in the evidence that would compel a reasonable factfinder to conclude that Defendants retaliated. See Trainor v. HEI Hospitality, LLC, 699 F.3d 19, 28 (1st Cir.2012) (treating "temporal proximity" between adverse employment action and protected conduct as just one factor, that has to be reinforced by other evidence).

Ceballos further declared that following the DOL complaint, management suspended her direct deposits and instructed SAL Bayamón's personnel to cease providing services to Ceballos or channel any administrative issue through Hernández. ECF 89-8, page 129, lines 16-20. These remarks, again, are insufficient to establish factual causation as to retaliatory actions against Ceballos. The fact that direct deposits were suspended sometime *after* filing a complaint does not imply by any means retaliation. Sánchez–Rodríguez v. AT & T Mobility P.R., Inc., 673 F.3d 1, 15 (1st Cir. 2012) (again noting that evidence of close temporal proximity *alone cannot prove retaliation*); Calero–Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 25 (1st Cir. 2004). Most importantly though, the record shows that

Ceballos admitted to having a deficit in sick and vacation leave days, reason for the suspension. ECF No. 89-16, page 28, lines 15-19.

Finally, note that in the deposition, Ceballos expresses that she was assigned cases for the same day she had a DOL appointment. ECF No. 89-8, page 76, 6-23. The court cannot, based on this remark alone, deny dismissing the retaliation claims. No reasonable factfinder will find that this was done as a direct and exclusive result of the complaint filed before the DOL when the rest of the record demonstrates otherwise. Even if so, it would be incorrect to base our conclusion on one single remark. See Wright, 352 F.3d at 478.

The above set of facts does not make us conclude that a reasonable factfinder would determine that the only reason for Defendants' actions was to cause harm to Ceballos because she complained (or took any other protected action). As stated, if the actions against Ceballos respond partly to another cause different from the fact she complained, then causation cannot be established. Consequently, upon reviewing the record, and since Ceballos failed to provide enough evidence to demonstrate causal nexus, the court **GRANTS** the Motion for Summary Judgment as to the Title VII Retaliation claims.

### D. State Law Claims

Ceballos also invoked supplemental jurisdiction over her state law claims under Laws No. 100 and 69, which prohibit sex discrimination; and Law No. 115, the state's anti-retaliation statute. In its Motion for Summary Judgment, Defendants invite the Court to dismiss the state law claims. As the court has only partially dismissed Ceballos' claims under federal law, it will only dismiss these claims in part—as to the retaliation claims.

### i.      Laws No. 100, 69 and 115

Laws No. 100 and 69 serve "virtually identical purposes and outlaw virtually identical behaviors." Miró Martínez v. Blanco Vélez Store, Inc., 393 F.Supp.2d 108, 114 (D.P.R. 2005). Law 100 prohibits general discrimination in the workplace by reason of age, race, color, sex, social or national origin, social status, and political or religious beliefs. Zayas v. Hosp. Int. Med. Avanzada, 137 D.P.R. 643 (1994). The Supreme Court of Puerto Rico held that sexual harassment constitutes a kind of sexual discrimination shunned by Law 100. Id. Law 69 represents more specific prohibitions on conduct proscribed by Law 100, and all three statutes form one legislative scheme to further the policy against discrimination. Suárez Ruiz v. Figueroa Colón, 145 D.P.R. 142, 148–49 (1998). Law 69 prohibits gender discrimination, and this court has held that this overlaps with Law 17's specific prohibition against sexual harassment in the workplace. Miró Martínez, 393 F.Supp.2d at 114.

Here, Ceballos' Title VII discrimination suit—based on hostile environment—survives Defendants' Motion for Summary Judgment. Consequently, the Court concludes that her discrimination and hostile environment claims under Laws 69, and 100 also withstand summary disposition. The court, therefore, **DENIES** Defendants' Motion for Summary Judgment on Ceballos' hostile environment claim under Puerto Rico law. Moreover, because it has been clearly recognized that personal liability is possible under state law, this court concludes that Laws 100 and 69 remain as to codefendants Vélez, Quiñones, Rentas, Hernández, and Cobián in their individual capacities as well.[31]

---

[31] Law 69 is to be interpreted in *pari materia* with Law 100. See Beauchamp, 116 D.P.R. at 526–27, (1985). Law 100, in turn, allows for individual liability. See Rosario v. Dist. Kikuet, Inc., 151 D.P.R. 634 (2000).

Conversely, Ceballos' state law retaliation claims stemming from the alleged adversary actions do not withstand summary judgment. Law 115 protects an employee against retaliation in case an employer discharges, threatens, or discriminates regarding the terms, conditions, compensation, location, benefits, or privileges of the employment should the employee offer or attempt to offer, verbally or in writing, any testimony, expression or information before a legislative, administrative or judicial forum in Puerto Rico." P.R. Laws. Ann., tit. 209 sec 194a(a). This provision is to be interpreted in a manner analogous to the Title VII retaliation provisions. <u>Rivera Rodríguez v. Sears Roebuck de Puerto Rico, Inc.,</u> 367 F.Supp.2d 216, 230 (D.P.R.2005); <u>McDonnell Douglas Corp. v. Green,</u> 411 U.S. 792 (1973).

In this case, the court dismissed Title VII retaliation because Ceballos was unable to demonstrate—or create—a triable issue as to the third element of a retaliation claim: causation between the protected conduct and the adverse employment action. Likewise, analogous claims under Law 115 must also be **DISMISSED WITH PREJUDICE.**

## V.      CONCLUSION

This court hereby **GRANTS IN PART AND DENIES IN PART** Defendants'
Motion for Summary Judgment (ECF No. 90). Accordingly, Ceballos' claims for sex and
national origin discrimination under Title VII remain against SAL but are **DISMISSED
WITH PREJUDICE** against all others. Similarly, claims pursuant to Laws No. 100 and 69
remain as to every defendant, including SAL. Notwithstanding, claims under Title VII
retaliation provisions as well as Law 115 are hereby **DISMISSED WITH PREJUDICE.**

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, October 7, 2020.


**S/ JUAN M. PÉREZ-GIMÉNEZ**
JUAN M. PÉREZ-GIMÉNEZ
SENIOR U.S. DISTRICT JUDGE